# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL INDICTMENT NO.** |
| **v.** | **1:16-cr-0187-CAP-JKL** |
| **TIMOTHY FRANKLIN KEEL,** | |
| **Defendant.** | |

## ORDER AND FINAL REPORT AND RECOMMENDATION

In a superseding indictment filed on September 14, 2016, Defendant Timothy Franklin Keel was charged with one count of producing child pornography in violation of 18 U.S.C. § 2251(a) and one count of distributing child pornography, in violation of 18 U.S.C. § 2252(a)(2). [Doc. 40.] Pending before the Court are Keel's Motion to Suppress Evidence [Doc. 21], Motion to Suppress Statements [Doc. 22], and Motion to Suppress Identification Testimony [Doc. 23]. For reasons discussed below, I **RECOMMEND** that all Motions to Suppress be **DENIED**.

## I.     BACKGROUND[1]

On April 6, 2016, the FBI posted an advertisement on Craigslist that appeared to be a mother soliciting someone to teach her nine-year-old daughter about sex.  (Tr. 30-31.)  A person using the alias "That Guy" responded to the posting through the Craigslist email service, stating that he was interested.  (Tr. 31.)  The undercover agent who was posing as the mother and "That Guy" then continued communicating via Kik Messenger, an application for cell phones and tablets that allows text messaging without a cell phone or cellular data.  (Tr. 32.) "That Guy's" screen name on Kik Messenger was "nolimitperv," and the profile picture was of an adult African-American man with black hair and several tattoos, including one on his chest.  (Tr. 33, 37.)  Using Kik Messenger, "nolimitperv" told the undercover agent that he had sexual experience with a friend's little sister and with an ex-girlfriend's daughter.  (Tr. 34.)  He also sent the undercover agent four sexually explicit photographs of minors, and told the agent that he had taken two of the photographs himself.[2]  (Tr. 34-35.)  He suggested that the agent show

_____

[1] An evidentiary hearing was held on the Motions to Suppress Evidence. [*See* Doc. 46 (transcript of proceedings).]  References to the transcript of that hearing are noted as "Tr. at __."

[2] Those photographs are the basis of Count 1 of the superseding indictment for production of pornographic material.

the photos to the daughter "to familiarize her with those kinds of images."  (Tr. 35.)  "Nolimitperv" then stopped communicating with the agent, but the FBI continued their investigation because they believed a child was at risk.  (Tr. 35-36.)

The FBI then took steps to identify "nolimitperv."  Through a subpoena to Kik Messenger, the FBI obtained a Gmail account associated with "nolimitperv's" Kik Messenger account.  (Tr. 36.)  A subpoena to Google revealed that the person with the Gmail account was using a cellular device to access Gmail and the international mobile equipment identifier for the device.[3] (Tr. 36-37.)  The FBI also ran analytics to find connections to the Gmail account, and discovered a profile picture from another website that appeared to match the profile picture of "nolimitperv."  (Tr. 37.)  An FBI analyst sent the picture to the Georgia Department of Driver Services for a facial recognition match, and Keel's photograph came back as the number one match.  (Tr. 38.)  The FBI also ran Keel's criminal history and obtained booking photos from prior arrests.  One of

---

[3] Every cellular device has a unique number known as a "mobile equipment identifier" or "IMEI" that allows the device to connect to cell phone towers.  (Tr. 36.)

3

the photos was of a chest tattoo that matched the tattoo in "nolimitperv's" profile picture. (*Id.*)

To locate the cellular device, FBI Special Agent Keith Kabrhel, the case agent for the investigation, obtained a pen register and trap and trace as well as warrants for geolocation data and cell tower data. (Tr. 29, 38-40.) Agents eventually determined that the device, a cell phone, was located at an extended stay motel in Norcross, Georgia. (Tr. 39-40.) A confidential human source who worked at the motel told law enforcement that Keel spent the daytime hours in and around Room 513 and in a Kia minivan parked outside of Room 513. (Tr. 41.) Kabrhel used that information to prepare a complaint and arrest warrant for Keel. (*Id.*) He also applied for and obtained search warrants for Room 513 and the Kia minivan. (Tr. 43.)

On April 25, 2016, a team of 12 law enforcement agents executed the search warrants. (Tr. 44-45.) Keel was arrested outside Room 513. (Tr. 49.) During a search of Keel incident to arrest, agents found on Keel's person an LG cell phone, a bag containing a white substance, and some money. (*Id.*)

Following Keel's arrest, Kabrhel and another agent transported Keel to the FBI's office. (Tr. 49-50.) While in the car, Kabrhel read Keel his *Miranda* rights

4

and then began speaking with Keel.  (Tr. 50.)  During the conversation, Keel stated that he had just found the cell phone that day.  Kabrhel took the cell phone out and asked Keel how to turn it on, and Keel told Kabrhel where the power button was located.  Kabrhel turned on the phone, opened the screen, and showed Keel where Kik Messenger was located.  Kabrhel asked Keel how to get back to the main menu of the phone, and Keel told him which buttons to press.  (*Id.*) Once Kabrhel went back to the main menu, he turned the phone off and did not touch it again until they were at the FBI's office.  (Tr. 50-51.)

After they arrived at the FBI's office, Keel was placed in an interview room.  (Tr. 52.)  He vehemently denied having sent child exploitation materials, and told the agents to look in his phone because there was information contained on the device that would exonerate him.  The cell phone was brought into the interview room and it was turned on so the agents could look at the phone with Keel. (*Id.*)

When they were finished with the cell phone, Kabrhel gave it to FBI digital extraction technician Robert Forrester.  (Tr. 7, 52.)  Forrester then plugged the phone into Cellebrite, a device that copies portable electronic devices for forensic examination.  (Tr. 9-10.)  Forrester's understanding was that he was authorized to

5

make a copy of the cell phone because the case agent told him that the search warrant for Room 513 covered the search of the phone. (Tr. 13.) Forrester made a logical image and a physical image of the phone.[4] (Tr. 11.) While the images were being created, Forrester was unable to look at any content of the phone. (Tr. 13.) It took approximately 90 minutes to extract data from the phone onto a flash drive. (Tr. 13-14.) But before Forrester could confirm that the extraction had successfully completed, Kabrhel told Forrester that, after consulting with the U.S. Attorney's Office, the decision was made to not use the extracted data and to hold onto the phone pending issuance of a new warrant. (Tr. 14, 22-24.) Forrester then deleted the data that had been extracted from the phone, and nobody viewed the data. (Tr. 14, 17.) He did not look at the data, nor did he attempt to process the extracted data for review or analysis. (Tr. 24.)

On April 29, 2016, Kabrhel obtained a search warrant for the cell phone. (Tr. 53, Gov't Exs. 4A & 4B.) Kabrhel then gave a copy of the warrant to Forrester and asked him to process the phone again. (Tr. 15, 54.) Forrester

---

[4] A logical image is similar to what one would see if one opened a device and scrolled through its contents. (Tr. 11.) It allows for the examiner to see text messages, among other things. (*Id.*) A physical image shows the file structure of the device, including deleted files. (Tr. 12.)

repeated the same process and extracted data from the cell phone to a flash drive. (Tr. 18.)

## II.   DISCUSSION

### A.   Motion to Suppress Evidence [Doc. 21]

In its brief opposing Keel's motion to suppress, the government's main argument is that the contents of the cell phone are admissible at trial under the inevitable discovery doctrine.  [Doc. 51 at 5-11.]  According to the government, the contents of the cell phone would have been discovered because routine investigative procedures would have inevitably led to child pornography found on Keel's cell phone.  [*Id.* at 7-8.]

I agree that the contents of Keel's cell phone should not be suppressed, but instead, under the "independent source doctrine"—a closely related, but distinct exception to the inevitable discovery doctrine.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  Evidence obtained directly (and indirectly) from a Fourth Amendment violation is not admissible at trial against a defendant.  *See United States v. Crews*, 445 U.S. 463, 470 (1980) ("The exclusionary prohibition extends as well to the indirect products of such

7

invasions.").  The Supreme Court has recognized at least three exceptions to this exclusionary rule involving the causal relationship between the unconstitutional act and the discovery of evidence, where the remedial objectives of the rule do not outweigh its substantial costs.  *Utah v. Strieff,* 136 S. Ct. 2056, 2061 (2016). Those exceptions include:  (1) the independent source doctrine, which allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source; (2) the inevitable discovery doctrine, which allows for the admission of evidence that would have been discovered even without the unconstitutional source; and (3) the attenuation exception, which permits the admission of evidence where the connection between unconstitutional conduct and the evidence is remote or has been interrupted by some intervening circumstance.  *Id.* (citing *Murray v. United States*, 487 U.S. 533, 537 (1988) (independent source doctrine); *Nix v. Williams*, 467 U.S. 431, 443-444 (1984) (inevitable discovery doctrine); and *Hudson v. Michigan*, 547 U.S. 586, 593 (2006) (attenuation doctrine)).

The inevitable discovery doctrine applies if the prosecution can establish that the challenged evidence "ultimately or inevitably would have been discovered by lawful means."  *Nix*, 467 U.S. at 444.  The Eleventh Circuit applies

8

a two-part standard to determine whether a showing of inevitable discovery has been made.   To qualify for admissibility, there must be (1) a reasonable probability that the evidence would have been discovered by lawful means, and (2) the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct.   *United States v. Satterfield*, 743 F.2d 827, 846 (1984) (citing *United States v. Brookins*, 614 F.2d 1037 (5th Cir. 1980)), *superseded by statute as to an unrelated issue as recognized in United States v. Edwards*, 728 F.3d 1286, 1292 (11th Cir. 2013).

I am not convinced that the inevitable discovery doctrine applies to the contents of the cell phone because the government is not seeking to introduce the data it obtained through an unconstitutional search.   Rather, the challenged evidence—the contents of the cell phone—was obtained pursuant to a later-issued search warrant.   Thus, the admissibility of the contents of the cell phone should be analyzed under the independent source doctrine because Kabrhel sought and obtained a search warrant *after* the initial unconstitutional search, and the information that Keel seeks to suppress was obtained through the execution of that warrant.   *See Strieff,* 136 S. Ct. at 2061.   Indeed, the Eleventh Circuit has

applied the independent source doctrine in cases similar to the one at bar. *See United States v. Barron-Soto*, 820 F.3d 409, 415-17 (11th Cir. 2016) (applying independent source doctrine where law enforcement officers conducted a warrantless search of cell phones seized from defendants and then later applied for and obtained a search warrant to search the phones); *United States v. Thomas*, 818 F.3d 1230, 1243 (11th Cir.) (holding that data seized from defendant's computer was admissible under independent source doctrine), *cert. denied*, 137 S. Ct. 171 (2016). The circumstances before the Court are more closely analogous to cases in which law enforcement makes an initial warrantless entry into a location and then obtains a search warrant for the same location. In those cases, the government bears the burden to show that the search warrant was obtained based on information from an independent source. *See Nix*, 467 U.S. at 444 & n.5.[5]

---

[5] On February 6, 2017, I held oral argument to address the applicability of the independent source doctrine to this case. At the hearing, counsel for Keel argued that the government had waived the doctrine by not expressly addressing the doctrine in its post-hearing brief. Counsel also cited cases, including *United States v. Thompson*, 710 F.2d 1500 (11th Cir. 1983), and *United States v. Thomas*, No. 2:10-cr-107-FtM-29DNF, 2011 WL 1118504 (M.D. Fla. Mar. 25, 2011), to support her argument.

While the government could have been more lucid in its argument, I decline to find a waiver under these circumstances. This is not a case in which

10

The Eleventh Circuit has adopted a two-part test to determine whether the evidence seized pursuant to the warrant is admissible under the independent source doctrine:

---

the government has abandoned or disclaimed a legal theory, only to attempt to revive it later.  Nor is it a situation where the Court has issued a ruling, and the government is attempting to have another bite at the apple.  *Cf. Thompson*, 710 F.2d at 1504; *Thomas*, 2011 WL 1118504, at *2.  The government's position all along has been that the later search warrant for Keel's cell phone was supported by probable cause based on facts that Kabrhel knew before he searched the phone and that routine investigation would have led to the phone being searched.  The government made that argument at the evidentiary hearing (*see* Tr. 6), and in its post-hearing brief [Doc. 51 at 11].

Moreover, the independent source doctrine is closely related to the inevitable discovery doctrine.  Both doctrines recognize that illegally-obtained evidence is admissible if the government proves that the evidence would have been acquired lawfully through an independent source absent the government misconduct.  In fact, the case on which the government principally relies, *United States v. Bah*, is best understood to be an independent source case.  [Doc. 51 at 8-10.]  In that case, the Sixth Circuit held that the warrantless search of a Blackberry did not taint subsequent searches of cell phones pursuant to a later-obtained warrant.  *Bah*, 794 F.3d 617, 633-34 (6th Cir.), *cert. denied*, 136 S. Ct. 561 (2015).  The *Bah* court did not specifically identify which exception to the exclusionary rule it was applying; however, it appears that the court was applying the independent source doctrine because the court analyzed whether a later search was tainted by an earlier, unconstitutional search, rather than whether the fruits of an illegal search were admissible.  Further, at least one of the cases that the *Bah* court relied on for its analysis, *United States v. Reilly*, 76 F.3d 1271, 1282 n.2 (2d Cir. 1996), itself applied the independent source doctrine.

Accordingly, I decline to find that the government should be barred from relying on the independent source exception to the exclusionary rule.

11

> First, we excise from the affidavit any information gained from the "illegal initial entry and determine whether the remaining information" supports a finding of probable cause.   If the remaining information supports a probable cause finding, we then determine whether the officers' "decision to seek the warrant was [not] prompted by what they had seen during the initial entry."   If the warrant would have been sought absent the illegal entry, the evidence seized pursuant to the warrant is admissible.

*United States v. Albury*, 782 F.3d 1285, 1291-92 (11th Cir. 2015) (alteration in original) (citations omitted); *see also United States v. Garcia*, 556 F. App'x 924, 925 (11th Cir. 2014); *United States v. Noriega*, 676 F.3d 1252, 1260-61 (11th Cir. 2012).

Presuming, as the government concedes, that the initial warrantless search was illegal and ignoring information that officers learned from the search, I readily conclude that the government has met its burden to show probable cause supported the issuance of the warrant.   Probable cause exists where, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  *Albury*, 782 F.3d at 1292. The probable cause section of Kabrhel's affidavit submitted in support of the search warrant for Room 513 is nearly identical to the probable cause section for the affidavit supporting the cell phone warrant.   (*Compare* Gov't Ex. 2, *with*

Gov't Ex. 4A.)   Kabrhel's affidavit in support of the warrant to search the cell

phone supplies the following information:

> 22.  On April 25, 2016 A [sic] federal judge authorized
> search warrants to look for evidence that Keel had
> distributed child pornography.   These search warrants
> authorized seizing electronic evidence, including cell
> phones.   One search warrant was for Room 513 of the
> Extended Stay Hotel, and the other search warrant was
> for a white Kia Sedona minivan.     Additionally, a
> complaint  authorizing  Agents  to  arrest  Keel  for
> distributing  child  pornography  had  previously  been
> issued.   The search warrants were executed on April 25,
> 2016.

> 23.  At the time that the warrants were executed, Keel
> was standing outside Room 513.   When he was arrested
> outside Room 513, he had his cell phone on his person,
> which Agents seized incident to arrest.

> 24.  It was my belief that the search warrants authorized
> Agents to look at the cell phone.   During a [sic] the
> transport to the FBI Atlanta office, Keel received
> *Miranda* warnings and waived his rights.   Keel and I
> discussed his usage of his cell phone.   Keel stated that
> he had lost his cell phone and had only found it the
> morning of the arrest.   Keel stated that the phone did not
> have a passcode and Keel assisted me in turning on his
> phone by explaining to me that the power button was on
> the back of the phone.   I showed KEEL that the Kik
> Messenger user ID for "nolimitperv" was in the Kik
> Messenger application.   The phone was then allowed to
> go into sleep mode.

> 25.  When Agents arrived with Keel at the FBI office, a
> copy of the cell phone was created processing it with a

> Cellebrite device. A Cellebrite device is used to create
> a copy of a phone's data and creates a report from the
> data. To date, nobody has looked at the Cellebrite
> report or the contents of the cell phone downloaded
> from Cellebrite, and no one has further accessed the
> phone by hand.

(Gov't Ex. 4A.)

Keel argues that Kabrhel would not have known the serial number of the

cell phone without removing the battery pack, nor would he have known that the

cell phone contained Kik Messenger with a user ID for "nolimitperv" had he not

searched the contents of the phone. [Doc. 55 at 4.] Excising those facts from the

Kabrhel's affidavit, I find that the remaining information supports a finding of

probable cause.[6] Kabrhel's affidavit details Keel's communications with the

_____

[6] I pause to note that I am not persuaded that the phone's serial number
constitutes information gained in an illegal search. Keel correctly concedes that
the seizure of the phone was lawful as incident to his arrest. [Doc. 49 at 15.]
Kabrhel testified that after the phone was seized, he obtained the serial number by
looking underneath the battery on the back of the phone. (Tr. 62-63.) At least
one other judge on this Court has concluded that removal of cell phone battery to
view identifying numbers without a warrant does not violate the Fourth
Amendment because the examination is minimally intrusive and concerns
physical features of a phone rather than data in which a defendant may have
privacy interests. *United States v. Vega-Cervantes*, No. 1:14-CR-234-WSD, 2015
WL 4877657, at *15 (N.D. Ga. Aug. 13, 2015). But even if removing the
phone's battery did amount to a Fourth Amendment violation, it does not change
the Court's analysis because even ignoring the serial number, probable cause
would still exist to authorize the search of the cell phone.

undercover FBI agent using Kik Messenger, a program that can be used on cellular and other internet-accessible devices; the FBI's efforts to locate Keel through his cell phone; a previous search warrant was issued for GPS location information for a cell phone believed to be in Keel's possession; and that when he was arrested, he had a cell phone in his possession.[7]  (*See* Gov't Ex. 4A.) Further, based on Kabrhel's training and experience, he stated that child pornographers commonly use email and messaging to distribute and receive pornographic materials and evidence of child pornography can be found on the user's devices.  Those facts—all of which were known to Kabrhel before the search of Room 513 and were therefore untainted by the initial search of Keel's cell phone—establish probable cause to believe that evidence related to child pornography would be stored in the phone.

Next, the Court must "determine whether the . . . decision to seek the warrant was 'prompted by' what [was] seen during the arguably illegal entry." *Noriega*, 676 F.3d at 1260.  This is "a question of fact."  *Id*. at 1263.

---

[7] Keel points out that Kabrhel's statement that the phone was found on Keel who was standing outside of Room 513 is a detail that connected the phone to the room.  [Doc. 55 at 4-5.]  But Keel also concedes that agents lawfully seized the phone incident to his arrest.  [Doc. 49 at 15.]  I see no basis to conclude that Kabrhel's statement about how the phone was obtained was tainted information.

Keel contends that the record is not sufficiently developed to support a finding that Kabrhel would have sought a search warrant for the phone regardless of the results of the initial search.  I disagree.  Kabrhel testified at the evidentiary hearing that he initially assumed that he could search the cell phone because he thought the area outside the motel room where it was seized was considered part of the curtilage of the room.  (Tr. 51.)  But then he spoke to the Assistant U.S. Attorney handling the case, who informed him the warrant for Room 513 did not extend to areas outside the room.  (Tr. 52.)  Kabrhel promptly halted the forensic analysis of the cell phone, and the extracted data was deleted and not reviewed by anyone.  (*Id.*)  On this record, I conclude that it was not the contents of the cell phone that Kahbrel observed that prompted him to obtain the warrant, but instead it was his realization that the initial search warrant might not cover the search of the device.

In sum, I find that the initial warrantless examination of Keel's cell phone does not provide a basis for suppression for the evidence obtained from the search executed pursuant to a later warrant.  Since Keel's cell phone was lawfully searched pursuant to a search warrant obtained under the independent source

doctrine, I recommend that Defendant's Motion to Suppress Evidence [Doc. 21] be denied.

**B.     Motion to Suppress Statements [Doc. 22]**

Keel has moved to suppress all statements that he made after he was detained.   [Doc. 22 at 1-2.]   At the evidentiary hearing, the government represented that in presenting its case in chief, it will not rely on any statements that Keel and that any such statements would be used only in rebuttal if Keel testified.  (Tr. 5, 16.)  Therefore, Keel's Motion to Suppress Statements [Doc. 22] should be denied without prejudice as moot.

**C.     Motion to Suppress Identification Testimony [Doc. 23]**

In response to Keel's Motion to Suppress Identification Testimony, the government has advised that it will not call as a witness the individual who identified Keel.   [Doc. 39 at 1-2.]   Accordingly, Keel's Motion to Suppress Identification Testimony [Doc. 23] should be denied without prejudice as moot.

**III.   CONCLUSION**

For the foregoing reasons, I **RECOMMEND** that Keel's Motion to Suppress Evidence [Doc. 21] be **DENIED** and that his Motion to Suppress Statements [Doc. 22] and Motion to Suppress Identification Testimony [Doc. 23] be **DENIED WITHOUT PREJUDICE AS MOOT**.

17

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

SO ORDERED AND RECOMMENDED this 8th day of February, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge